UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- X

MICHAEL GARVEY,

                            Plaintiff,

          -v-

TOWN OF CLARKSTOWN, NEW YORK,
TOWN BOARD OF THE TOWN OF
CLARKSTOWN, ALEXANDER J. GROMACK,
Individually, and as Supervisor for the Town of
Clarkstown, New York, MICHAEL SULLIVAN,
Individually, and as Chief of Police for the Town
of Clarkstown, New York, and JOHN AND
JANE DOES "1-10",

                         Defendants.

------------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: February 22, 2018

13-cv-8305 (KBF)

OPINION & ORDER

KATHERINE B. FORREST, District Judge:

      On January 9, 2008, Sergeant Michael Garvey, a police officer employed by

the Town of Clarkstown, injured his knee while making an arrest. Over the next

two years, he received disability benefits under N.Y. Gen. Mun. Law § 207-c ("§ 207-

c") and was not required to work. In April 2010, defendants[1] requested a physical

examination pursuant to the collective bargaining agreement ("CBA") between the

Town of Clarkstown ("the Town") and Garvey's union. The doctor determined that

the 2008 injury had healed and that any remaining injury was due to a pre-existing

---

[1] Defendant Alexander Gromack is the Town Supervisor for the Town of Clarkstown. Defendant
Michael Sullivan was the Police Chief of Clarkstown until his termination in 2017. The Town of
Clarkstown maintains the police department and was Garvey's employer. The Town acts through
the Town Board as the Police Commission.

"gouty" condition. As a result, defendants ordered Garvey to return to work and offered him a transitional "light duty" position. This spurred a complicated chain of events—described in detail below—that involved a § 207-c hearing, an adjudication that Garvey has a permanent disability that did not occur in the line of duty, several state court proceedings, and even a surprise early-morning quarrel on a Saturday at 6:30 a.m. in the police station. These events gave rise to the instant action, which Garvey filed in federal court on November 20, 2013, during the pendency of state court proceedings.

Here, Garvey asserts five causes of action: an Americans with Disabilities Act ("ADA") claim for failure to make a reasonable accommodation available; an ADA claim for retaliation; two analogous state law claims; and a First Amendment claim under 42 U.S.C. § 1983. In July-September 2017, the parties cross-moved for summary judgment. Initially, the Court denied that motion, (ECF No. 233), as there seemed to be a question of fact as to whether a reasonable accommodation was available for plaintiff.

However, upon review of the parties' submissions in advance of trial, it became clear to the Court that, in reality, no question of fact exists. As will be discussed more fully below, the Clarkstown police department does not have positions that require only "light duty"—and it was never the case that it did. While three other officers have served in a light duty capacity, this position does not exist as a matter of course; when it has existed, it was for a previously-specified period of time, and in two instances, it was the specific result of a <u>sui generis</u>

settlement. Garvey—who rejected a similar settlement—has not raised a triable issue of fact as to whether a reasonable accommodation existed; it is clear from the evidence presented that one did not.

For the reasons presented below, the Court GRANTS summary judgment in favor of defendants.

## I.  BACKGROUND[2]

### A.  The Role of a Police Sergeant and Various Past Accommodations

The Town of Clarkstown has three roles to which sergeants may be assigned for a particular shift: patrol sergeants, turnout sergeants, and, as particularly relevant here, desk sergeants. There is one desk sergeant per shift, and he or she "takes command of communications, takes command of the dispatch, . . . [and] [h]as responsibility for interfacing with lieutenants, the captains and chiefs during the day tours. It's the point person for the tour, but you're inside." (ECF No. 201-3, Dorfman Decl. in Supp. of Def.'s Mot. for Summ. J. ("Dorfman Decl."), Ex. C ("Garvey Dep.") at 63:5-11, 70:11-12.) The desk sergeant also supervises officers with perpetrators or suspects in the cell area. (Id. at 74:21-75:3.) All police

---

[2] Pursuant to Local Civ. R. 56.1(c), "[e]ach numbered paragraph in the statement of material facts . . . will be deemed to be admitted . . . unless specifically controverted . . . in the statement required to be served by the opposing party." Courts may reject conclusory, non-responsive objections that "advocate for a different spin on otherwise uncontroverted facts." Hartley v. Rubio, 785 F. Supp. 2d 165, 171 n.1 (S.D.N.Y. 2011) (citing Local Rule 56.1(c)); see also Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 312 (2d Cir. 2008)).

   There are numerous instances where plaintiff neither admits nor denies a fact, but rather (1) adds additional facts, (2) quibbles with defendants' characterization of the fact, (3) argues a fact is immaterial to resolution of the motion for summary judgment, or (4) makes legal arguments. There are also numerous instances where, although plaintiff "denies" a fact in form, he does not actually controvert the fact in substance. In all such instances, defendants' asserted facts are deemed admitted to the extent they are properly supported and to the extent plaintiff's dispute is not in fact supported by the exhibits he cites.

sergeants—including desk sergeants—must be able to walk, stand, sit, run for prolonged periods of time and/or over rough terrain, stoop, bend, kneel, crawl, crouch, reach, twist, carry things and people, subdue people, tackle people, and wrestle with people. (ECF No. 201-26, Dorfman Decl., Ex. K ("May 18, 2012 § 207-c Hearing Tr.") at 190–93 (Garvey's testimony).) Typically, sergeant roles are assigned anew for each shift; no sergeant is permanently designated as "the desk sergeant."

At certain times, however, when a police officer or sergeant is injured, the Town works with him or her to devise a specific resolution such that the officer may continue to work in some "light duty" capacity until he or she has healed.[3] The Town has no formal policy defining when officers or sergeants may serve on "light duty." Its only policy, General Order 215, became effective on December 5, 1988 and states that the "Chief of Police shall retain complete discretion in approving or denying any officer the privilege of light duty." (ECF No. 201-63, Dorfman Decl., Ex. NN.)

Other injured sergeants and officers who required a "light duty" post were assigned the desk sergeant or desk officer roles for a longer-than-usual period of time (i.e., for more than one shift at a time). In at least one case, the assignment involved additional restrictions, such as an inability to sit for more than forty-five minutes at a time. Often, the specific accommodations would be coordinated

---

[3] The parties' 56.1 statements and responses, as well as their briefs, quibble over the definition and characterization of a "light duty" assignment. The characterization of the work performed by Garvey and/or Sgt. No. 1 is immaterial to resolution of the case.

pursuant to settlement agreements. Each instance of a "light duty" post presented by the parties has differed, as each was tailored to specific restrictions that arose from a particular officer's injury. The position of desk sergeant never existed as a permanent assignment for any officer—nor did any other "light duty" post.

For example, Sgt. No. 1[4] served in the role of desk sergeant from August 2011 until his retirement in January 2013 pursuant to a settlement agreement with the Town. The agreement limited his assignment to 18 months in a "restricted or light duty capacity at police headquarters," which allowed him to reach twenty years of service and retire. (ECF No. 201-65, Dorfman Decl., Ex. PP.) Sgt. No. 1 was restricted from standing or sitting for long periods of time; he was not subject to restrictions regarding physical contact with the public or prisoners, nor did he have to be insulated from emergency situations. Neither the cause of his injury nor its permanence was determined at any formal hearing.

Separately, Sgt. No. 2 was given a light duty assignment under § 207-c due to line of duty injuries to both of his ears, which caused significant hearing loss. When Sgt. No. 2's doctor found that he was permanently disabled, he subsequently "filed for service retirement," remarking in his notice that it "was a pleasure to be of service to the residents of the Town of Clarkstown for the past 22 years." (ECF No. 225-7, Dorfman Decl., Ex. MMM.) The Town submitted a letter to the union noting that it did not offer any "permanent 'light duty' positions and the filing of [Sgt. No.

---

[4] The names of two sergeants and one officer are under seal; in this Opinion, the Court uses the pseudonyms that the parties have used throughout this litigation.

2's] service retirement should in no way be interpreted . . . as [Sgt. No. 2] having voluntarily removed himself from the workforce." (ECF No. 225-9, Dorfman Decl., Ex. OOO.)

Police Officer No. 3 ("P.O. No. 3") also suffered a line-of-duty injury. Like Sgt. No. 1, he entered into a settlement agreement with the Town to continue his § 207-c status until he was granted a New York State disability retirement or was eligible for service retirement. Pursuant to his settlement agreement, P.O. No. 3 would only be ordered back to work when his disability ended or when he became capable of performing a light duty assignment. Like Sgt. Nos. 1 and 2, he was never adjudicated permanently disabled.

B. Garvey's History and Adjudication

On January 17, 1994, Garvey was hired by the Town of Clarkstown as a police officer. At that time, he was fit for full duty—that is to say, he was able to perform all of the essential functions of a police officer. In 2004, Garvey was promoted to sergeant, a supervisory position within the department. On January 9, 2008, Garvey injured his left knee in the line of duty while making an arrest. Defendants accepted the injury as occurring in the line of duty under § 207-c, afforded Garvey disability benefits, and assumed responsibility for the medical costs associated with his left knee. (ECF No. 201-73, Dorfman Decl., Ex. XX ("Decision and Order of Hon. Gerald E. Loehr, dated February 21, 2013") at 2.) On July 20, 2008, Garvey underwent arthroscopic surgery on his left knee. (Id.)

Under the CBA between the Town and the Rockland County Patrolmen's Benevolent Association, Inc. ("PBA"), the Town could have Garvey medically examined from time to time to determine whether the disability had ceased or whether Garvey was able to physically perform his duties. (ECF No. 201-60, Dorfman Decl., Ex. KK at 15.) Accordingly, on April 5, 2010, Garvey was examined by Dr. John Mazella, a Board-certified orthopedic surgeon. Dr. Mazella concluded that Garvey had a pre-existing "gouty" condition in his left knee that was exacerbated by his injury on January 9, 2008, but that the line-of-duty injury had "resolved to status quo ante through the orthopedic treatment . . . and that [Garvey's] complaints of continuing pain were not supported by his physical condition." (Decision and Order of Hon. Gerald E. Loehr, dated February 21, 2013.)

In response, the Town notified Garvey on April 19, 2010 that he was to report for full duty on April 22, 2010—more than two years after the line-of-duty injury occurred—and that his § 207-c benefits were terminated. However, Garvey requested time to see his own doctor before returning to work. On April 26, 2010, the Town sent Garvey a letter notifying him that he could "start [his] return on transitional, restricted-duty status to allow [him] time to reacquaint [him]self with the relevant procedures and routines of [his] position." (Id.) On May 12, 2010, Garvey's own physician, Dr. Jordan Simon, disputed Dr. Mazella's conclusion that Garvey could return to full duty as a police officer, though he noted that "light duty" would be an option if available. The Town again directed Garvey to report for "restricted duty." However, Garvey refused to return to work, even in this

capacity—which both doctors had approved. He received an additional letter instructing him to return on May 29, 2010 to work in a transitional, restricted duty capacity consistent with the limitations described by Garvey's own physician. Thus, on May 29, 2010, Garvey returned to work in a restricted desk sergeant position.

However, on May 26, 2010, Garvey had requested a § 207-c hearing; the Town denied the request on June 2, 2010. The PBA, pursuant to the CBA, then requested a hearing on Garvey's behalf to determine, inter alia, whether Garvey was fit for full duty. The Town denied that request because all doctors agreed that Garvey could at least perform a light duty position, which he had been offered. On October 19, 2010, the PBA demanded arbitration to resolve whether a § 207-c hearing was required. While arbitration was pending, defendants had Dr. Mazella reexamine Garvey; on April 25, 2011—over a year after defendants' first order—defendants issued another order that directed Garvey to return to full duty on May 2, 2011. (Dorfman Decl., Ex. DD.) In May 2011, Garvey sought an injunction in state court prohibiting the Town from terminating him based on his refusal to return to full duty. In response, the Town represented in open court that it would not take an adverse employment action against Garvey while the arbitration was pending. Thus, Garvey's action for injunctive relief was dismissed as moot. On July 14, 2011, the Town issued a letter re-instituting Garvey's restricted duty status pending the determination of whether a hearing would be granted. (ECF No. 201-53, Dorfman Decl., Ex. DDD.)

On January 7, 2012, the Arbitrator ruled that under the CBA, Garvey had the right to a § 207-c hearing. In accordance with the arbitrator's decision, a hearing officer was appointed to determine (1) whether Garvey was able to perform his regular police duties and (2) whether his left knee complaints are related to an injury in the line of duty.[5]

At the time of the Arbitrator's ruling, Garvey had been serving as a desk sergeant for eighteen months (since May 2010) and he had received at least one positive performance evaluation from his supervisors. (Garvey Dep. at 78:9-81:22.) But after the Arbitrator's decision, Garvey took the position that he no longer had to report for restricted duty. (ECF No. 201-56, Dorfman Decl., Ex. GG.) This decision was not connected in any way with the condition of his knee injury. (Garvey Dep. 85:21-86:1.) Rather, it was Garvey's position that he was not required to work until the hearing was held and a conclusion was reached. Sullivan informed Garvey that if he failed to fulfill his light duty assignment, he would be considered absent from duty without proper authorization. (ECF No. 201-57, Dorfman Decl., Ex. HH.) Nevertheless, Garvey did not return to work.[6]

Between March 23, 2012 and August 10, 2012, the § 207-c hearing was held over seven days. Garvey, Town representatives, three doctors, and a physical

---

[5] A third question—whether Garvey had absented himself from the light duty assignment he was performing prior to the arbitrator's decision granting the request for a hearing—was at one point certified. After Garvey objected, the hearing officer ruled that this question was not timely and more appropriately reviewed as a grievance.

[6] Even now, Garvey contends that he should receive § 207-c benefits for this time. The Town maintains that Garvey elected to use his accumulated sick leave in lieu of § 207-c payments to cover his absence.

therapist testified. During those proceedings, Garvey testified that his knee condition was permanent and that he could not perform various functions of a police officer. (See, e.g., ECF No. 201-29, Dorfman Decl., Ex. L ("May 24, 2012 § 207-c Hearing Tr.") at 444:17-445:19; Garvey Dep. at 55:7-12.) Garvey testified that, as of the hearing, the problem with his knee was that it buckled once in a while, but less than it did immediately after the injury. (May 24, 2012 § 207-c Hearing Tr. at 241:4-242:6.) Specifically, he identified two occasions on which his knee buckled on the slanted ramp to the lower-level food court in Grand Central Station—neither of which is alleged to have been related to any activity in Garvey's capacity as a police sergeant. (Id. at 242:7-19.)

The hearing officer ultimately determined that Garvey was permanently unable to perform regular police duties, but that this inability was the result of his pre-existing gout condition, rather than the January 9, 2008 line-of-duty incident. Notably, during the hearing, defendants offered Garvey a settlement similar to Sgt. No. 1's agreement.[7] However, Garvey rejected the offer, "waved his hand in the air and said, I'll get what I want in Federal Court." (ECF No. 201-8, Dorfman Decl., Ex. D-3 at 228:15-17.)

On November 20, 2012, the Town accepted and adopted the hearing officer's Findings of Fact and Recommendations. (ECF No. 201-62, Dorfman Decl. Ex. MM.) In the same resolution, the Town terminated Garvey's § 207-c benefits, as the

---

[7] While Garvey disputes the existence of this offer, the evidence he cites—his own declaration—makes no mention of the receipt or non-receipt of a settlement offer. (See ECF No. 206, Garvey Aff.)

adjudicator had decided his knee condition was not connected to a line-of-duty injury. The Town further determined that the arbitrator's grant of the § 207-c hearing did not excuse Garvey from continuing the transitional light duty assignment he had received; accordingly, the leave time Garvey had used up was not re-credited as he had demanded.

As a result of the hearing, Garvey's attorney, Dennis Lynch, sent the Town's attorney, Amy Mele, a letter on November 8, 2012 requesting, inter alia, that the Town advise Garvey of the reasonable accommodation that would be made for him pursuant to the ADA, as he is not "physically able to perform 'regular police duties' at this time." (ECF No. 201-66, Dorfman Decl., Ex. QQ.) Chief Sullivan determined that a light duty position was not available for Garvey, as light duty positions were provided only on a temporary basis—there was no permanent position for someone with permanent restrictions.[8] On November 28, 2012, Mele notified Lynch that Garvey was due to run out of his accrued leave time on December 7, 2012 and requested more information about Garvey's request under the ADA. (ECF No. 201-68, Dorfman Decl., Ex. SS.) Specifically, she asked how Garvey is disabled, what barriers to job performance his disability created, and what reasonable accommodation Garvey suggested that would permit his return to work without eliminating any of the essential functions of a police officer. (Id.)

---

[8] Plaintiff disputes this, arguing that Sullivan's deposition testimony demonstrates that the timeline of the denial was slightly different. (ECF No. 208, Pl.'s Response to Def. Michael Sullivan's Statement of Undisputed Material Facts Pursuant Local Rule 56.1 ¶ 167.) Plaintiff further argues that Sullivan testified that he denied light duty solely because light duty was not available to permanently disabled officers. (Id.) These disputes are immaterial to the resolution of this case.

On Saturday, December 1, 2012 at 6:30 a.m., after almost eleven months of absence and without any prior notification, Garvey arrived at the police station and attempted to relieve the desk sergeant.  He was informed that there was no position available for him.  Sullivan went to the station to respond to Garvey's surprise grandstanding, and he advised Garvey that Garvey could make a formal request for a light duty position under General Order 215; Sullivan then sent Garvey home.  Garvey maintains that his arrival at work was in response to the May 27, 2010 letter—which he had received 18 months earlier—ordering him back to work.  (Garvey Dep. at 89:10-18.)

On December 4, 2012, Sullivan sent a memo to Garvey reminding him that the correct course of action—rather than simply showing up at the station and "attempt[ing] to order a working sergeant to stand down so [Garvey] could assume the desk"—was to request a temporary light duty assignment under General Order 215.  (ECF No. 205-30, Marzolla Decl., Ex. CC.)  Sullivan also noted that he would consider Garvey's previous request to return to work as a request under General Order 215, and informed him that such request requires "a doctor's note advising the nature of the injury, the duration that light duty will be required and any restrictions and limitations the doctor feels should be followed."  Because Garvey's previously submitted doctor's note did not indicate a period of time, Sullivan would not consider his request.  (Id.)  Garvey responded in an email the same day, arguing that by asking for a doctor's note, Sullivan was "directing me to follow a futile exercise when you know (more so than anyone in the administration) my medical

situation and have a position currently available for me . . . ." (ECF No. 205-12, Marzolla Decl., Ex. L.)

Also on December 4, 2012, the parties' lawyers were in communication. Mele notified Lynch that based on Garvey's testimony at the § 207-c hearing, he could not perform the essential functions of a police officer, including "taking resistant persons into custody, breaking up fights, carrying a distressed child, extracting accident victims from a motor vehicle or subduing a physically attacking person."[9] (ECF No. 201-69, Dorfman Decl., Ex. TT.) Again, Mele requested a response as to "what 'reasonable accommodation(s)' . . . Sgt. Garvey envision[s] as allowing him to safely overcome his impairment." (Id.) On December 5, Garvey's attorney responded, claiming that the "Town has continued to refuse to engage in the ADA's interactive process" and that the "Town is aware of Sergeant Garvey's physical conditions, his limitations, and his suitability for a Desk Sergeant post or office work." (ECF No. 201-70, Dorfman Decl., Ex. UU.) While the letter accused the defendants of "retaliatory conduct" and advised that this would be Lynch's "final reply letter," it failed to provide the information previously requested and did not describe in any detail the position Garvey sought. It did contend that another individual with similar limitations—presumably Sgt. No. 1—had been given a "desk

---

[9] Garvey purports to dispute the characterization of this back-and-forth. (ECF No. 208, Pl.'s Response to Def. Michael Sullivan's Statement of Undisputed Material Facts Pursuant Local Rule 56.1 ¶ 179.) However, for the reasons discussed in more depth below, Garvey's objections are immaterial to the resolution of the case; furthermore, Garvey himself agreed that "a sergeant has all the requirements of a police officer at the base level" and that a sergeant has the "physical fitness requirements of a regular cop." (ECF No. 188-20, Flannery Decl., Ex. T at 189:23-190:14.)

sergeant" position as a reasonable accommodation and assert a view that "the position is currently available."  (Id.)

By December 7, 2012, Garvey's leave had depleted; he was accordingly removed from payroll and notified of a termination of his medical benefits.  The next day, Sullivan sent Garvey a memo advising him that he was "not authorized to return to work at this time and any attempt to do so will be considered a direct violation of orders."  (ECF No. 205-31, Marzolla Decl., Ex. DD (emphasis in original).)  The memo also stated that it was "not true" that Sullivan knows the "true nature" of Garvey's disability, and if he was "truly serious about returning to work," he would have "called my secretary and set up an appointment to discuss." (Id.)  Sullivan also notified Garvey that, "[o]ut of concern for your family I have contacted the Personnel Department and you will be receiving a letter stating how you can arrange to have your family medical benefits continue uninterrupted while these issues are worked out."  (Id.)  On December 12, 2012, Sullivan sent Garvey a letter informing him that "until your employment status can be worked out, you are no longer authorized to act as a police officer under the authority of the Clarkstown Police Department" and directing him to turn in his badge, identification, and firearm.  (ECF No. 205-42, Marzolla Decl., Ex. OO.)

On December 18, 2012, Garvey commenced a proceeding in state court to annul the Town's November 20, 2012 Resolution.  The New York Supreme Court denied that request but transferred the proceedings to the Appellate Division for determination of whether the hearing officer's findings were supported by the

evidence. While that action was pending, Garvey filed this federal action on November 23, 2013. On June 24, 2015, the Appellate Division confirmed the hearing officer's determination, which held that there was

> no dispute that the petitioner was able to perform a light-duty assignment. In May 2010, he received and followed an order to return to work and perform a restricted duty assignment, for which he received his full salary. On January 17, 2012, he refused an offer to continue performing this light-duty assignment, although he remained able to [do] so. Under the statute, the granting of a General Municipal Law § 207-c hearing did not excuse him from performing his light-duty assignment. The petitioner later received an unequivocal order to return to his light-duty assignment, and he again refused, electing instead to use his accumulated leave time. Since the petitioner refused to return to his light-duty assignment commencing January 17, 2012, the Town was entitled to discontinue his benefits without a hearing. Accordingly, the Town's determination not to re-credit the accumulated leave time . . . was not arbitrary and capricious and must be confirmed.

(ECF No. 201-74, Dorfman Decl., Ex. YY, Decision, Order & Judgment of the Appellate Division, at 4.)

Subsequently, on July 7, 2015, the Town notified Garvey that it intended to terminate his employment pursuant to Civil Service Law § 73, which states that "when an employee has been continuously absent from and unable to perform the duties of his position for one year or more by reason of a disability other than a disability resulting from occupational injury . . . his employment status may be terminated . . . ." (ECF No. 201-75, Dorfman Decl., Ex. ZZ.) (At this point, Garvey had been absent for more than three years due to an injury that had been adjudicated non-duty related, not including his two-year absence while he received § 207-c benefits between 2008-2010.) Garvey objected in a letter dated August 4, 2015, arguing, <u>inter alia</u>, that his injury was work-related and that he was entitled

15

to a light-duty accommodation under the ADA and General Order 215.  (ECF No. 205-41, Marzolla Decl., Ex. NN.)  On August 11, 2015, Garvey was terminated based on, <u>inter alia</u>, over a year of absence.  (ECF No. 205-11, Marzolla Decl., Ex. K.)

Garvey challenged his termination in a letter on September 4, 2015, in which he argued he was "ready, willing and able to return to work"; he also demanded a post-termination hearing.  After the Town responded that an article 78 hearing would be the appropriate vehicle, Garvey initiated an article 78 proceeding on December 10, 2015 in the New York Supreme Court.  The basis of the new petition was that Garvey's disability was work-related, but even if it were not, he was fully fit to return to work and was also fit for what in his view constituted light duty.  Garvey also argued that the Town violated the ADA and General Order 215, and that he was denied pre- and post-termination hearings.

The New York Supreme Court dismissed Garvey's petition, holding that the July 7, 2015 letter was sufficient notice of his termination—indeed, his attorneys had responded with a ten-page letter of their own, (ECF No. 205-41, Marzolla Decl., Ex. NN)—and that a post-termination hearing was not required, as petitioner had been adjudicated disabled and had not offered new evidence that he was able to return to full duty.  "[S]ince Petitioner's position was that of a full time Sergeant and not some type of light-duty hybrid, absent a voluntary accommodation under General Order 215 or as mandated under the ADA, again, there is nothing to have a hearing about."  (ECF No. 201-77, Dorfman Decl., Ex. BBB ("Decision and Order of

Hon. Gerald E. Loehr, dated December 21, 2016") at 10.)  Because a federal ADA

action had already been commenced by Garvey, the Court declined to address the

ADA question and dismissed the rest of the petition on the merits without

prejudice.

The federal action, now pending for almost four-and-a-half years, was

initially before Judge Karas.  It was transferred to the undersigned on September

28, 2017.

## II.   LEGAL PRINCIPLES

### A. <u>Summary Judgment Standard</u>

"The court shall grant summary judgment if the movant shows that there is

no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial

burden of demonstrating "the absence of a genuine issue of material fact."  <u>Celotex

Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  When the moving party does not bear

the ultimate burden on a particular claim or issue, it need only make a showing

that the non-moving party lacks evidence from which a reasonable jury could find in

the non-moving party's favor at trial.  <u>Id.</u> at 322-23.

In making a determination on summary judgment, the court must "construe

all evidence in the light most favorable to the nonmoving party, drawing all

inferences and resolving all ambiguities in its favor."  <u>Dickerson v. Napolitano</u>, 604

F.3d 732, 740 (2d Cir. 2010).  Once the moving party has discharged its burden, the

opposing party must set out specific facts showing a genuine issue of material fact

for trial. Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (internal citations omitted).

   B. ADA Claims

       Plaintiff has brought both discrimination and retaliation claims under the ADA, 42 U.S.C. §§ 12112(a), 12203(a). The ADA makes it unlawful for an employer, with respect to hiring or discharge, to "discriminate against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a). In addition, the ADA prohibits employers from retaliating against an individual for "oppos[ing] any act or practice made unlawful" by the ADA. 42 U.S.C. § 12203(a). The ADA applies to employers; it does not confer individual liability. Spiegel v. Schulmann, 604 F.3d 72, 79 (2d Cir. 2010). For that reason, the ADA claims against the individual defendants here—i.e., Gromack and Sullivan—cannot succeed. Id. However, the Court still must consider whether plaintiff has made out an ADA claim against the Town and the Town Board.

       1. Reasonable Accommodations

       To establish a prima facie case of discrimination based on failure to accommodate, a plaintiff must establish that (1) he is a person with a disability; (2) defendant had notice of his disability; (3) plaintiff could perform the essential

functions of the job at issue with reasonable accommodation; and (4) defendant refused to make such accommodations. Graves v. Finch Pruyn & Co., 457 F.3d 181, 184 (2d Cir. 2006). "A reasonable accommodation can never involve the elimination of an essential function of a job." Shannon v. New York City Transit Auth., 332 F.3d 95, 100 (2d Cir. 2003) (citing Gilbert v. Frank, 949 F.2d 637, 642 (2d Cir. 1991)). "The term 'essential functions,' which is not defined in the statutes themselves, is generally defined in ADA regulations . . . to mean the 'fundamental' duties to be performed in the position in question, but not functions that are merely 'marginal.'" Stone v. City of Mount Vernon, 118 F.3d 92, 97 (2d Cir. 1997) (citing 29 C.F.R. § 1630.2(n)(1) (1996)). The considerations in the regulations are "fact-intensive" and "no one listed factor will be dispositive." Id.

The plaintiff bears the burdens of both production and persuasion as to "the existence of some accommodation that would allow [him] to perform the essential functions of [his] employment, including the existence of a vacant position for which [he] is qualified, as well as "whether the costs of the accommodation do not on their face obviously exceed the benefits." McBride v. BIC Consumer Prods. Mfg. Co., 583 F.3d 92, 97 & n.3 (2d Cir. 2009); see also Jackan v. New York State Dep't of Labor, 205 F.3d 562, 567 (2d Cir. 2000) (holding that an ADA plaintiff must demonstrate that a "suitable vacancy existed at the time he sought transfer"). "An ADA plaintiff does not satisfy [his] burden to identify a potential accommodation merely by reciting the formula that [his] employer could have reassigned [him]." McBride, 583 F.3d at 97.

Assuming plaintiff can make out a prima facie case (and this Court does not find that plaintiff here can), the burden would shift to defendant under the analysis of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-03 (1973), to show a legitimate, nondiscriminatory purpose for its allegedly adverse action. <u>See</u> <u>Raytheon Co. v. Hernandez</u>, 540 U.S. 44, 49-50, (2003); <u>Reg'l Econ. Cmty. Action Program, Inc. v. City of Middletown</u>, 294 F.3d 35, 48-49 (2d Cir. 2002).

2. <u>Interactive Process</u>

"The ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated." <u>Jackan</u>, 205 F.3d at 566 (citing <u>Beck v. University of Wis. Bd. of Regents</u>, 75 F.3d 1130, 1135 (7th Cir. 1996); 29 C.F.R. § 1630.2(o)(3)). This engagement may occur through, <u>inter alia</u>, "request[ing] information about the condition and what limitations the employee has, ask[ing] the employee what he or she specifically wants, show[ing] some sign of having considered [the] employee's request, and offer[ing] and discuss[ing] available alternatives when the request is too burdensome." <u>Lovejoy-Wilson v. NOCO Motor Fuel, Inc.</u>, 263 F.3d 208, 219 (2d Cir. 2001) (alterations in original) (citing <u>Taylor v. Phoenixville Sch. Dist.</u>, 174 F.3d 142, 162 (3d Cir. 1999)).

"Nevertheless, an employee may not recover based on his employer's failure to engage in an interactive process if he cannot show that a reasonable accommodation existed at the time of his dismissal." <u>Stevens v. Rite Aid Corp.</u>, 851 F.3d 224, 231 (2d Cir.), cert. denied, 138 S. Ct. 359 (2017) (citing <u>McElwee v. County</u>

of Orange, 700 F.3d 635, 642 (2d Cir. 2012)); see also McBride, 583 F.3d at 100-01

(noting that "failure to engage in an interactive process does not form the basis of

an ADA claim in the absence of evidence that accommodation was possible . . .

because the ADA imposes liability for . . . discriminatory refusal to undertake a

feasible accommodation, not mere refusal to explore possible accommodations

where, in the end, no accommodation was possible" (internal quotations and

citations omitted)).

    3. Retaliation

"The ADA makes it unlawful for an employer 'to coerce, intimidate, threaten,

or interfere with any individual in the exercise or enjoyment of . . . any right

granted or protected by this chapter'" or to "discriminate against any individual

because such individual has opposed any act or practice made unlawful by this

chapter or because such individual made a charge, testified, assisted, or

participated in any manner in an investigation, proceeding, or hearing under this

chapter." Lovejoy-Wilson, 263 F.3d at 222-23 (2d Cir. 2001) (citing 42 U.S.C. §

12203(a)-(b)).

To establish a prima facie case of retaliation, a plaintiff must show that: (1)

he engaged in a protected activity; (2) defendant was aware of that activity; (3) he

suffered an adverse employment action; and (4) there was a causal connection

between that protected activity and the adverse employment action. Distasio v.

Perkin Elmer Corp., 157 F.3d 55, 66 (2d Cir. 1998). McDonnell Douglas burden-

shifting likewise applies to retaliation claims under the ADA. Terry v. Ashcroft,

335 F.3d 128, 141 (2d Cir. 2003). "With respect to the first element of a retaliation claim, participation in a protected activity, . . . a 'plaintiff need not establish that the conduct he opposed was actually a violation of the statute so long as he can establish that he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated that law.'" Muller v. Costello, 187 F.3d 298, 311 (2d Cir. 1999) (quoting Sarno v. Douglas-Elliman Gibbons & Ives, Inc., 183 F.3d 155, 159 (2d Cir. 1999)).

C. First Amendment Claims Under § 1983

"To state a prima facie claim of First Amendment retaliation under Section 1983, [a plaintiff] must offer some tangible proof that 1) [his] speech was constitutionally protected; 2) [he] suffered an adverse employment action; and 3) a causal relationship between the two existed in that the speech was a substantial or motivating factor for the adverse employment action." Burkybile v. Bd. of Educ., 411 F.3d 306, 313 (2d Cir. 2005). The First Amendment confers protection on government employee speech made "'as a citizen addressing matters of public concern.'" Weintraub v. Bd. of Educ., 593 F.3d 196, 200 (2d Cir. 2010) (quoting Garcetti v. Ceballos, 547 U.S. 410, 417 (2006)). "Whether the employee spoke solely as an employee and not as a citizen is also largely a question of law for the court." Jackler v. Byrne, 658 F.3d 225, 237 (2d Cir. 2011).

Speech addresses a matter of public concern when it may be "'fairly considered as relating to any matter of political, social, or other concern to the community.'" Wrobel v. Cnty. of Erie, 692 F.3d 22, 28 (2d Cir. 2012) (quoting

Connick v. Myers, 461 U.S. 138, 146 (1983)).  "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record."  Johnson v. Ganim, 342 F.3d 105, 112 (2d Cir. 2003) (citing Connick, 461 U.S. at 146).  "If the speech, however, is focused on matters personal to the employee, it cannot be classified as being on a matter of public concern and the government, acting as an employer, 'has greater latitude to discipline' the employee."  Id. (quoting Connick, 461 U.S. at 146).

In other words, "the court should focus on the motive of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose."  Lewis v. Cowen, 165 F.3d 154, 163–64 (2d Cir. 1999); see also Hanig v. Yorktown Cent. Sch. Dist., 384 F. Supp. 2d 710, 722 (S.D.N.Y. 2005) ("The key inquiry is whether the statements were made by plaintiff in her role as a disgruntled employee or her role as a concerned citizen.").

D. Spoliation

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."  West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d Cir. 1999).  "[A]nyone who anticipates being a party or is a party to a lawsuit must not destroy unique, relevant evidence that might be useful to an adversary."  Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 217 (S.D.N.Y. 2003).  "The obligation to preserve evidence arises when the party has notice that the evidence is

relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." Fujitsu Ltd. v. Fed. Express Corp., 247 F.3d 423, 436 (2d Cir. 2001).

"The state of mind of a party that destroys evidence is a major factor in determining whether an adverse inference is the appropriate sanction." Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 74 (S.D.N.Y. 1991). "Where a party destroys evidence in bad faith, that bad faith alone is sufficient circumstantial evidence from which a reasonable fact finder could conclude that the missing evidence was unfavorable to that party." Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 109 (2d. Cir. 2002). "Similarly, a showing of gross negligence in the destruction or untimely production of evidence will in some circumstances suffice, standing alone, to support a finding that the evidence was unfavorable to the grossly negligent party." Id.

By contrast, "where the destruction was merely negligent," plaintiff must also "demonstrate that the destroyed evidence would have been favorable to" him, "since in those cases it cannot be inferred from the conduct of the spoliator that the evidence would even have been harmful to him." Zubulake, 220 F.R.D. at 221; see also Residential Funding Corp., 306 F.3d at 109 ("[T]he party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that the destroyed [or unavailable] evidence would have been of the natvire alleged by the party affected by its destruction.") (internal quotation omitted); Turner, 142 F.R.D. at 77 ("[W]here the destruction was negligent rather

24

than willful, special caution must be exercised to ensure that the inference is commensurate with information that was reasonably likely to have been contained in the destroyed evidence.").

To establish the relevance of destroyed documents, plaintiff must "demonstrate through extrinsic evidence, such as other existing documents or deposition testimony, that a reasonable jury could find that the missing [evidence] would have been favorable to his claims." Curcio v. Roosevelt Union Free Sch. Dist., 283 F.R.D. 102, 113 (E.D.N.Y.2012).

> Although a district court has broad discretion in crafting a proper sanction for spoliation, we have explained that the applicable sanction should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine. The sanction should be designed to: (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party.

West, 167 F.3d at 779 (internal citation and quotation omitted).

## III.  DISCUSSION

### A.  ADA Claims

Garvey has failed to demonstrate the existence of a vacant position which he was able to fill.  Furthermore, he—not defendants—failed to engage in the interactive process required by the ADA.  As such, his claim under the ADA for discrimination on the basis of failure to accommodate fails as a matter of law. Second, he has not established that there was a causal connection between any adverse employment action and any protected activity on his part; as such, his

retaliation claim also fails.  Accordingly, the Court grants summary judgment to defendants on both ADA claims.

    1.  <u>Failure to Demonstrate Existence of a Reasonable Accommodation</u>

There is simply no evidence in the record that a desk sergeant position existed in the way Garvey sought to have it exist.  Rather, the position existed on a case-by-case basis for officers with impermanent disabilities: the Town would work with injured officers to identify a "light duty" position while they healed or until they reached retirement.  As such, there was never an "open slot" for a light duty position, which Garvey might have been able to fill.  Garvey has sought to transform a temporary light duty assignment provided to other officers, often pursuant to a settlement, into an open position with reduced responsibilities and physical demands—this is not what the ADA requires. Nor does it require defendants "to create new jobs or reassign disabled employees if no positions are vacant." <u>Felix v. New York City Transit Auth.</u>, 154 F. Supp. 2d 640, 655 (S.D.N.Y. 2001), aff'd, 324 F.3d 102 (2d Cir. 2003) (citing <u>Norville v. Staten Island Univ. Hosp.</u>, 196 F.3d 89, 99 (2d Cir. 1999)); <u>see also</u> <u>Norville</u>, 196 F.3d at 99 ("For example, an employer need not reassign an employee if no position is vacant. Nor is the employer obliged to create a new position to accommodate the employee." (internal citations omitted)).

Garvey maintains that the Town's accommodations for Sgt. No. 1, Sgt. No. 2, and P.O. No. 3 demonstrate that a vacant position existed for him.  But this is not the case.  First, none of the others' situations were analogous to Garvey's.  Sgt. No.

1 and P.O. No. 3 both received accommodations pursuant to settlements. Accordingly, their "light duty" roles cannot be evidence of the existence of a permanent position; rather, they were allowed as terms of settlement agreements.[10] Sgt. No. 2's circumstances are also inapposite; once it was determined that he was permanently disabled, he retired.

Moreover, even if their situations did apply, the fact that someone else occupied a light-duty position does not mean that a similar position was available for Garvey to fill. Garvey argues that Sgt. No. 1 was "contemporaneously vacating his light duty Desk Sergeant assignment in and around the time Defendants constructively terminated Plaintiff (i.e., 1/2013)." (ECF No. 211, Pl.'s Mem. of Law in Opp. to Def.'s Mots. for Summ. J. and in Supp. of Pl.'s Cross Mot. for Partial Summ. J. ("Pl.'s Mem. in Opp.") at 3.) However, as noted, Sgt. No. 1 was not occupying a position that typically existed within the apartment; rather, he was acting in a light duty capacity pursuant to a settlement agreement with the Town. It is not as if, once Sgt. No. 1 retired, there would be a vacant position that defendants would need to fill. Rather, once Sgt. No. 1 retired, the department could simply return to its usual state—which includes desk sergeants who have no physical restrictions. Additionally, P.O. No. 3's settlement was not signed until October 16, 2014—well after this case was filed. (ECF No. 205-46, Marzolla Decl., Ex. SS.)

---

[10] Furthermore, Sgt. No. 1 was restricted only from standing or sitting for long periods at a time; Garvey's restrictions were much more cumbersome and more likely to interfere with a police officer's usual duties.

The Town is not "obligated to create a new light-duty position for a disabled employee or make permanent previously temporary light-duty positions.  Moreover, lax enforcement of the temporary nature of temporary light-duty assignments does not transform such assignments into permanent positions."  King v. Town of Wallkill, 302 F. Supp. 2d 279, 291 (S.D.N.Y. 2004) (internal citations omitted).  The fact that Garvey and others served in light-duty positions temporarily does not, therefore, mean that the Town must create these vacancies where they would not otherwise exist.

Furthermore, Garvey did not demonstrate that he engaged in the ADA's "interactive process" in good faith.  Rather, the post-hearing letters and emails submitted by both parties demonstrate that the Town repeatedly asked for information as to Garvey's disability as well as a suggestion as to which position might be a reasonable accommodation.  Rather than respond to these questions, Garvey accused the Town of retaliation, threatened legal action, and refused to engage.  His sudden appearance at the police station on December 1, 2012—after an eleven-month absence—was no more than grandstanding in response to being notified that he was due to run out of leave.  Showing up at 6:30 a.m. on a Saturday is not an attempt to engage; had Garvey wanted to negotiate, he would have taken Sullivan's suggestion and set up a time to discuss options.

2.  Retaliation

Similarly, Garvey has failed to demonstrate that defendants retaliated against him for exercising his rights under the ADA.  Garvey argues that he

28

engaged in a protected activity by requesting a reasonable accommodation in the form of a light duty position, and that defendants took adverse action by "requiring more of Sgt. Garvey (in the form of a doctor's note giving the disability's end [date]) than was required under the [department's] express written policy or had ever been required of anyone else during his tenure."[11]  (Mem. Opp. at 28-29.)

As discussed above, Sullivan instructed Garvey to submit a request for a light duty position under General Order 215, which requires a doctor's note that specifies how long an injury or disability is expected to last.  While General Order 215 does not list specific requirements that must accompany a sergeant or officer's request, it does leave the decision to the "complete discretion" of the Chief of Police.  Certainly, this leaves room for the Chief to require certain documentation with requests. Garvey argues that a doctor's note explaining the expected duration of a disability had never been required of anyone else, but he offers no evidence to support this assertion.  And even if it were the case, it could be the case that, consistent with General Order 215, the Chief may require documentation from some officers and not others, based upon the circumstances presented.

Additionally, while not clearly stated, Garvey alludes to a claim that defendants took adverse action by denying his request for a light duty position.  As

---

[11] Garvey notes that this allegedly adverse action was one of several actions taken in retaliation, but does not specify any other actions.  Additionally, the evidence submitted does not clearly identify any retaliatory action.

discussed at length above, this denial was proper, as no reasonable accommodation existed for Garvey.[12]

\* \* \*

Accordingly, the Court grants summary judgment on Garvey's ADA claims in favor of defendants.

## B. Section 1983 Claim

Garvey has also filed a claim under 42 U.S.C. § 1983 for violation of his First Amendment rights. He identifies the following activities as protected by the First Amendment: (1) filing a union grievance; (2) testifying at his GML § 207-c hearing; and (3) filing the federal complaint. (Pl.'s Mem. in Opp. at 37-40.) None of these actions give rise to a First Amendment retaliation claim. Government employees have First Amendment rights when speaking on matters of public concern—all of the speech and actions identified by Garvey focus on "matters personal to the employee." Johnson, 342 F.3d at 112.

---

[12] Additionally, the materials in support of Garvey's spoliation claim imply that after this litigation was filed, defendants engaged in a number of actions to retaliate against plaintiff. (ECF No. 210, Decl. of Donald J. Feerick ("Feerick Decl.").) Specifically, Garvey claims that defendants released confidential information about him, investigated him for illegal campaign contributions, and boycotted his car wash. However, "a party cannot assert a claim for the first time in its motion papers." Dominick & Dominick LLC v. Deutsche Oel & Gas AG, 2017 WL 3669619, at *5 (S.D.N.Y. Aug. 24, 2017).

Garvey did not plead claims of post-termination retaliation in his complaint; indeed, he filed his complaint almost two years before he was terminated. These claims are asserted only through the Feerick Declaration, which was submitted in opposition to the motion for summary judgment, in support of a spoliation motion, and after the close of discovery. None of the allegations are mentioned in plaintiff's Rule 56.1 Statement or in his memorandum of law. On this basis as well, plaintiff cannot succeed on these retaliation claims. Moreover, the assertions in the Feerick Declaration are unsupported by evidence connecting any protected action by Garvey—under the ADA or the First Amendment—to adverse actions by defendants. Conclusory statements alleging libel or slander are not enough.

Citing Jackler, 658 F.3d 225, Garvey argues that "[o]fficial misconduct is always a public concern." (Mem. in Opp. at 29.) That is certainly the case. But Jackler addressed a public official who, the Court held, was acting as a private citizen when he refused to file a dishonest police report. Jackler, 658 F.3d at 241-242. The circumstances here are quite different. Garvey's speech—i.e., his grievance, his hearing testimony, and his federal complaint—was "calculated to redress personal grievances." The actions all related to Garvey's employment status; he was not acting "'as a citizen addressing matters of public concern.'" Weintraub v. Bd. of Educ., 593 F.3d 196, 200 (2d Cir. 2010). There was no broader public purpose manifested. Lewis, 165 F.3d at 163-64.

Even if Garvey's speech were protected by the First Amendment, he has not established that his alleged "speech" was a substantial factor in any adverse employment action. Garvey was not terminated until 2015—two years after the filing of this federal action, and three-five years after the bulk of the events at issue. Defendants repeatedly directed him to report for a light duty position until 2012; at that time, his disability status had been adjudicated, and as discussed, defendants were within their rights to inform him that no position was available. There is no evidence in the record that his termination—or any other action by defendants— was motivated by Garvey's grievance, testimony, or federal lawsuit. Thus, judgment on Garvey's § 1983 claim is granted in favor of defendants.

C. <u>Spoliation Claim</u>

In his cross-motion for summary judgment, Garvey argues that defendants have engaged in "massive spoliation of evidence." (Mem. in Opp. at 34.) Specifically, Garvey asserts that "despite their discovery sanctions,"[13] defendants "disregarded" their discovery obligations despite actual notice, and "engaged in a rolling production, in delayed fashion." (<u>Id.</u> at 36.) Specifically, Garvey claims that defendants failed to search or review information which would likely show that Sullivan continued to retaliate against Garvey through July 20, 2016, and that 12,413 files were deleted from his computer during the pendency of this case. He also claims that defendants failed to produce emails surrounding the November 2015 elections, during which Sullivan claimed that Garvey made illegal campaign contributions to achieve a settlement.

No finding of spoliation was made during the pendency of this action, and in any case, the spoliation assertion is inadequate on the merits. Garvey fails to proffer facts supporting the requisite intent for a spoliation claim. He claims that evidence of intent "is found in the "actions of the Police Department in allowing Police Chief Sullivan himself to investigate" the disclosure of personal information

---

[13] In 2014, defendants moved to amend their answer to include five additional defenses. Plaintiff opposed, alleging, <u>inter alia</u>, bad faith. Magistrate Judge Smith held that defendants' "delay in seeking to add the new affirmative defense appears to be the result of a lack of diligence, as opposed to an intention to vex Plaintiff or the Court." (ECF No. 41, Decision & Order at 11.) However, she also noted, <u>inter alia</u>, that "[w]hat suggests bad faith is Defendants' assertion that Plaintiff would not be prejudiced because 'Plaintiff was informed that Defendants would be seeking to amend their answer to include the additional affirmative defenses before any depositions had been taken, and nearly three months prior to the close of discovery." (<u>Id.</u>) As a result, Magistrate Judge Smith ordered defendants to pay for any additional discovery costs due to the amended answer. (<u>Id.</u> at 41.)

about Garvey to a local newspaper "when the Chief had personal involvement in the matter, as the communication with the local news reporter in Spring 2016 appears to have been the purpose behind why the Chief put his thoughts about Plaintiff in written form. The Chief assumed control over that investigation and intentionally limited that investigation to avoid disclosure of his own misconduct in scheming to leak the preferred story to the press. The Chief thus only documented 'evidence' that he wanted discovered." (ECF No. 230, Pl.'s Reply Mem. of Law in Opp. to Def.s' Mots. for Summ. J. and in Further Supp. Of Pl.'s Cross Mot. for Partial Summ. J. ("Pl.'s Reply Mem.") at 20-21.) Additionally, Garvey argues, other police captains severed the police departments with a car wash of which Garvey was a co-owner "because they did not want to do any business with any entity in which Plaintiff could benefit, as owner." (Id. At 17.) However, Garvey cites no evidence in support of any of these assertions—they are merely self-serving, conclusory allegations. This is not enough to meet the substantial burden a plaintiff bears in a motion for spoliation sanctions.[14]

Even if there had been deletion of evidence, that does not, on its own, support a motion for spoliation sanctions. Garvey has not demonstrated that the deleted information was relevant to his claims in this litigation, and he has not demonstrated—or even suggested—defendants had the requisite intent. Accordingly, this application also fails.

---

[14] The Court notes that plaintiff's motion for spoliation sanctions appears, in several respects, to be an effort to introduce new allegations of retaliation in violation of the ADA and the First Amendment. This is not the appropriate vehicle for those claims.

D. <u>State Law Claims</u>

Having granted summary judgment in favor of defendants on all of Garvey's federal claims, the Court declines to exercise supplemental jurisdiction over his remaining state law claims.

IV.    CONCLUSION

For the reasons stated above, the Court GRANTS summary judgment in favor of defendants.  The Clerk of Court is directed to enter judgment and terminate case 13-cv-8305.

SO ORDERED.

Dated:      New York, New York
            February 22, 2018

_____
KATHERINE B. FORREST
United States District Judge